STATE OF OKLAHOMA, EX REL. THE OKLAHOMA TAX COMMISSION, APPELLANT, V. GEORGE B. RODGERS AND BERTHA M. RODGERS, RESPONDENTS.—193 S. W. (2d) 919.

St. Louis Court of Appeals. Opinion filed April 16, 1946.

1116

*E. L. Mitchell, E. J. Armstrong* and *C. W. King* for appellant.

*John P. McCammon* of counsel.

*Wm. H. Biggs* and *Davis Biggs* for respondents.

*Biggs, Curtis & Crossen* of counsel.

ANDERSON, J.—This is an action by the State of Oklahoma, at the relation of the Oklahoma Tax Commission, for the collection of an income tax obligation incurred by respondents while they were residents of Oklahoma. The petition filed was in words and figures as follows:

"The State of Oklahoma, on relation of the Oklahoma Tax Commission, for its cause of action against the Defendants, alleges and states:

"The Oklahoma Tax Commission is an agency created by the laws of the State of Oklahoma with power of collection and enforcement of taxes, including the taxes accruing under the net income tax laws of said state, and as such is vested with powers to sue and be sued in the courts of this and other states. Said Oklahoma Tax Commission, as now constituted, together with its powers, is defined in Chap. 1, Title 68, Secs. 1-12c, inclusive, Oklahoma Statutes, 1941, and also Chap. 32 of said Title 68, Oklahoma Statutes, 1941, being what is commonly referred to as the Uniform Tax Procedure Act.

"Under Section 1464 of Title 68, Oklahoma Statutes, 1941,

" 'The taxes, fees, interest, and penalties, embodied by any State Law, or by this Act, from the time same shall·become due, may be collected in the same manner as a personal debt of the taxpayer, to the State of Oklahoma; recovered in any court of competent jurisdiction in any action in the name of the State of Oklahoma, on relation of the Oklahoma Tax Commission. Such suit may be maintained, prosecuted, and all proceedings taken to the same effect and extent as for the enforcement of a right of action for debt. All provisional remedies available in such actions shall be, and are hereby made available to the State of Oklahoma in the enforcement of the payment of any State tax . . . '

"Section 1483 of said Title 68, Oklahoma Statutes, 1941, reads as follows:

" 'The courts of this State shall recognize and·enforce liability for taxes lawfully imposed by other states which extend a like comity to this State.'

"The laws of the State of Missouri applicable to this case are found in Sec. 856, R. S. 1939, Missouri Statutes Annotated, and read as follows:

" 'Whenever a cause of action has accrued under or by virtue of the laws of any other state or territory, such cause of action may be brought in any of the courts of this state, by the person or persons entitled to the proceeds of such cause of action: Provided, such person or persons shall be authorized to bring such action by the laws of the state or territory where the cause of action accrued.'

"Plaintiff states that the Defendants, while residents of Tulsa Counnty, State of Oklahoma, earned and received income taxable under the laws of the State of Oklahoma as follows, to-wit:

| "Year | Date Assessed | Assessment | Date of Interest @ 1% Per Month to Notice and Demand | 9-10-44 | Total |
|-------|---------------|------------|--------------------------------|---------|-------|
| 1936 | 7-30-38 | $ 593.91 | 9-3-38 | $429.10 | $1,023.01 |
| 1935 | 5-24-40 | 1,126.84 | 7-3-40 | 566.23 | 1,693.07 |
| 1934 | 5-24-40 | 616.20 | 7-3-40 | 309.64 | 925.84 |
| 1933 | 5-24-40 | 759.74 | 7-3-40 | 381.76 | 1,141.50 |

$4,783.42

"Copies of the respective Orders of Assessment and the Returns of the taxpayers for the years 1933 to 1936, inclusive, are attached hereto and marked "Exhibits 1-2-3 and 4" and said Returns and the Orders of Assessment are made a part of this Petition.

"Plaintiff further states that the said tax so computed, as aforesaid, is delinquent, due and unpaid, that the interest as hereinabove shown is likewise due and unpaid, that the total amount of tax and interest of $4,783.42 should bear interest from date of filing of this Petition at the rate of six percent (6%) per annum until paid.

"Wherefore, Plaintiff prays judgment against the Defendants in the sum of $4,783.42 with interest as aforesaid, at the rate of six percent (6%) per annum from the date of the filing of this petition and for such further orders in the premises as the court deems meet and proper, with all costs of suit in this behalf expended."

To this petition defendants filed a general demurrer, which the court sustained. Plaintiff then refused to plead further. Thereupon a judgment of dismissal was entered. From this judgment plaintiff has appealed. At the time the trial judge sustained the demurrer, he filed a memorandum which shows that he sustained the demurrer on the ground that the courts of Missouri will not entertain suits to enforce the revenue laws of a sister state. In this court appellant challenges the trial court's ruling and seeks a reversal of the judgment.

There are no Missouri decisions either way on the proposition presented. However, the weight of authority from other jurisdictions supports the ruling of the trial judge.

The first application of the rule that "one state will not enforce the revenue measures of another" is attributed to Lord Hardwicke, in Boucher v. Lawson, 1734, Cases Temp. Hardwicke 85, 95 Eng. Rep. 53. In that case plaintiff shipped gold from Portugal to England in defendant's ship. Under the law of Portugal, the exporting of gold was prohibited: This probably was a revenue measure. When the ship arrived in London, the master of the vessel refused to deliver the cargo to plaintiff, and the latter brought an action against the owner. The defense interposed was that since it was illegal to export gold under the laws of Portugal, the parties were *participes criminis*, and the law should refuse a remedy. This defense was denied on the ground that to allow it would "cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of our trade."

The next case, and the first which directly enunciated the rule, was Holman v. Johnson, 1775, 1 Cowp. 341, 98 Eng. Rep. 1120. In that case plaintiff, a resident of Dunkirk, sold and delivered a quantity of tea to the defendant, knowing that defendant intended to smuggle the tea into England. When plaintiff sued for the purchase price, defendant resisted the suit on the ground that the contract for the sale of the tea was founded upon an intention to make an illicit use of it, and that therefore plaintiff was not entitled to the assistance of an English court to recover the price. The court held that since the contract and delivery were made abroad, no law of England had been transgressed. In the course of the opinion the court said that with regard to contracts legally made abroad, the laws of the country where the cause of action arose should govern, but he did not see how the principles on which that doctrine obtains were applicable to the present case. Lord Mansfield then, by way of pure *dictum*, added: "For no country ever takes notice of the revenue laws of another."

A few years later Lord Mansfield decided the case of Planche v. Fletcher, 1779, 1 Dougl. 251, 99 Eng. Rep. 164. In that case plaintiffs insured goods on board a vessel sailing from London to France. The ship, however, cleared for Ostend, Belgium. Later it was captured by the enemy, England and France being at war at the time. Plaintiffs then sued the underwriters, who defended on the ground that there was fraud on the underwriters in clearing the ship for Ostend, when she never was intended to go there. The court decided for plaintiffs on the ground that what had been practiced in this case was proved to be the constant course of the trade, and was well known to everyone connected therewith. Lord Mansfield then went on to say that it did not appear why it was the custom to clear

for Ostend, but possibly Ostend duties were lower than those between England and France. He further said that the motive did not matter because "One nation does not take notice of the revenue laws of another." This statement was pure *obiter dictum.*

In 1823, the case of James v. Catherwood, 3 Dow. & Ry. 190 was decided. In that case plaintiff sued for money lent to defendant in France. To prove the loan, receipts were tendered in evidence. Defendant objected to the introduction of the receipts, and offered to show that by the law of France such receipts required a stamp. The trial judge ruled that the receipts were admissible without the stamp, and rejected defendant's proffered evidence. Upon motion for new trial this ruling was affirmed, the court saying:

"This point is too plain for argument. It has been settled, or at least considered as settled, ever since the time of Lord Hardwicke, that in a British Court we cannot take notice of the revenue laws of a foreign state. It would be productive of prodigious inconvenience, if in every case in which an instrument was executed in a foreign country, we were to receive in evidence, what the law of that country was, in order to ascertain whether the instrument was or was not valid."

The next case on the proposition appears to be Sharp v. Taylor, 1848, 2 Phill. 801, 41 Eng. Rep. 1153. Sharp and Taylor, British subjects, bought and repaired an American built ship, on a joint speculation, with a view to using her in trade between the two countries, until they could re-sell her to advantage. With this in view, they registered the ship in the name of Robertson, a citizen of the United States, upon the false declaration that she was the *bona-fide* property of Robertson. After several voyages, Taylor, who had the management of the ship, refused to share the profits with Sharp. The latter brought suit, and Taylor defended on the ground that since the false registration was a fraud upon American law, no suit could be maintained. The court held the defense to be invalid by saying that the courts of England would not refuse to decide rights of joint importers simply because in the course of their business some fiscal law of a foreign country had been violated.

It is from the foregoing cases that the rule contended for by respondent, and applied by the trial court, had its origin. In none of them was an attempt made to collect a tax due to a foreign state, but in each case the question presented was whether a contract made to evade a foreign revenue law or which did not comply with the revenue laws of the *locus contractus* was enforceable in England; and, in each case, the ruling was based upon a desire to promote commercial convenience. But, such a consideration has no place in determining whether the states in the American Union should co-operate in enforcing revenue measures of sister states. Such co-operation could have no adverse effect upon commerce.

The first application of the doctrine in the United States appears in Ludlow, et al., trustees for the creditors of Randall v. Van Rensselaer, 1806, 1 Johns. (N. Y.) 93. In that case defendant executed a promissory note in France, payable to Alexander Stewart, agent of Randall. Stewart, the payee, resided in New York, where the note was to be paid. By the laws of France, all notes for the payment of money were required to be stamped, and no recovery could be had upon a note in that country unless a stamp were affixed. It was held that the plaintiffs could recover in New York notwithstanding the absence of the stamp. The court said:

"The payee of this note, though it was made in France, resided at the time, within this state, where it was to be paid. As we do not sit here to enforce the revenue laws of other countries, it is perfectly. immaterial, in a suit before us, whether or not the note was stamped according to the laws of France. Such a duty is not imposed upon us, nor if it be admitted that the law of France, in this instance, has been violated, are we bound to take notice of such violation. If it were otherwise, it might well be said, that the parties never contemplated exacting the payment of this note in that country, and this would form a sufficient excuse here, for not adhering rigidly to a matter, extrinsic and formal, as to the contract, though it might be necessary, in order to sustain an action in the courts of France."

There is no indication that the New York court was influenced by the policy favoring freedom of commerce.

The first time that any court intimated that the doctrine should be applied to a situation as here presented was in 1843, in the case of Henry v. Sargeant, 13 N. H. 321. That case was an action brought in New Hampshire, for damages resulting from the imprisonment of plaintiff in Vermont, until he paid a tax assessed by the city of Chester, in Vermont. The defendants contended that the court should not take jurisdiction inasmuch as the revenue laws of another state were involved, citing Holman v. Johnson, James v. Catherwood, and Randall v. Rensselaer. In dismissing this contention, the court said:

"There is no attempt to enforce the penal or revenue laws of Vermont by this action. If there were, it would be held that this was not to be done through the instrumentality of the courts of another state; as, for instance, if the attempt was to collect a tax assessed in Vermont by a suit here."

No reasons nor authority were given for this statement.

Then appears the leading case of Colorado v. Harbeck, 1921, 232 N. Y. 71, 133 N. E. 357. In that case a testator, domiciled in Colorado, left home with the intention of going abroad. While en route, he died in New York. His will was probated in New York, a transfer tax was paid in New York, and the estate, consisting entirely of personalty, was distributed to the legatees, none of whom were residents of Colorado. After the administration was completed, the State

of Colorado instituted proceedings in its courts to assess a transfer tax under its laws. Notice was given to all the defendants, being the executrix and legatees, by mail, as required by the Colorado statutes. None of the defendants appeared. Thereafter, the State of Colorado brought a suit in New York to collect the tax. Relief was denied. The chief reason for denying relief was that inasmuch as Harbeck had left no property in Colorado, and defendants were neither residents nor personally served in Colorado in the tax proceedings, the order and assessment were invalid under the due process clause of the Fourteenth Amendment to the Federal Constitution, citing Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565. In passing on the point the court rejected plaintiff's contention that the fiction of *mobilia sequuntur personam* operated to bring the property into Colorado for the purpose of giving power to make a valid assessment. In addition to the constitutional objections, the court pointed out that the Colorado statutes had not been strictly complied with, and that they provided an exclusive remedy for the collection of the tax. The court also denied the contention that since the act gave power to the attorney general to enforce the tax by a common-law action, he had authority to bring suit in New York. The court said that the attempt to give such a statutory provision extra-territorial effect would conflict with the well-settled principle of private international law which precludes one state from acting as a collector of taxes for a sister state and from enforcing its penal and remenue laws as such.

In Estate of Martin, 1930, 136 Misc. Rep. 51, 240 N. Y. Supp. 393, testatrix, domiciled in Connecticut, died leaving tangible personal property and a savings bank acount in Connecticut, and also tangibles and intangibles in New York City. Her will was admitted in an original probate proceeding in New York County, and shortly thereafter her executor removed all the personal property in Connecticut to New York, without paying the admittedly valid Connecticut inheritance taxes. Connecticut intervened in the accounting proceedings of the New York executor, and asked the surrogate court for an order transmitting the assets to Connecticut unless the executor paid the taxes due on it. Held, that since the revenue laws of a foreign state have no force in New York, and since New York courts cannot be employed to aid in the collection of foreign taxes, the objections raised by the State of Connecticut must be dismissed and decree entered directing distribution of the estate.

In State of Maryland v. Turner, 1911, 75 Misc. Rep. 9, 132 N. Y. S. 173, two suits were brought against the defendant, one by the State of Maryland, and the other by the Mayor of Baltimore, for the amount of taxes assessed against defendant on his personal property while he was a resident of Baltimore. The court sustained a general demurrer to the petition. Plaintiffs contended that since the Maryland courts had in effect construed a tax liability as contractual, it

should be so considered in New York, and recovery should be permitted, as in the case of any other foreign contract action. But, the New York court held that whether a foreign tax is a penal law or a contractual obligation is to be determined by the law of the forum, and that since under the New York law the obligation to pay a tax is not contractual, but its imposition operates in invitum, recovery could not be had.

In re Bliss' Estate, 1923, 121 Misc. 773, 202 N. Y. Supp. 185, is factually identical to the Harbeck case, except that the State of Vermont, through its commissioner of taxes, requested that after the payment of administration expenses, taxes, and debts, the assets be transferred to the executors in Vermont. The court held that:

"The far-reaching consequence of the approval of such action must be apparent, even to those unfamiliar with the intricacies of transfer tax litigation. Such procedure far exceeds any question of comity, and would create a system whereby each state would become the busy collection agent of another state in gathering its taxes. The property might be directed to be transferred from state to state, and depleted to the vanishing point by successive taxation."

The federal court has applied the same doctrine in Moore v. Mitchell, 1929, 30 Fed. (2d) 600, an appeal from a judgment of the United States District Court in New York. In that case suit was brought by the county treasurer of Grant County, Indiana. The defendants were the executors of the last will and testament of Richard Edwards Breed. Breed had been domiciled in Grant County, Indiana, from 1903 until the time of his death in 1926. While a resident of Indiana, he owned certain intangibles, but had made no return or payment of taxes in respect thereto. An assessment of unpaid back taxes due Grant County was made after Breed's death. After the assessment was made, the county treasurer, pursuant to the provisions of an Indiana statute, which authorized him to sue in the courts of Indiana, brought the present suit. The bill contained no allegation that any of the property of deceased was ever physically within the State of Indiana, or that deceased died in Indiana. No lien was claimed to have been imposed upon any property of the deceased by reason of the proceeding for the assessment of taxes. Held, that the trial court properly dismissed bill; that "the effort to collect a tax, for a political subdivision of Indiana, is repugnant to the settled principles of private international law, which preclude one state from acting as a collector of taxes for a sister state, and from enforcing its penal or revenue laws as such." It was also held that under the due process clause of the United States Constitution, Amendment XIV, the State of Indiana had no jurisdiction to impose a tax, because neither the property nor the deceased was within the jurisdiction at the time the tax was assessed.

Judge Hand, in a concurring opinion, expressed the view that it might be embrarrassing for the courts of one state to be called upon to scrutinize the relations of a foreign state with its citizens; that such a practice might lead to many delicate situations. We fail to see that this is a valid objection to accepting jurisdiction in such cases. The foreign state would not be likely to object or to be offended over such procedure because it is the one seeking relief and is asking the court to scrutinize those relations. The taxpayer could have no valid objection, since he can assert the same defenses in the Missouri court that he could have relied upon had he been sued in the courts of the taxing state, and he is thus fully protected.

The decision of the Circuit Court of Appeals in the above case was affirmed by the United States Supreme Court on the ground that plaitniff lacked capacity to sue. For that reason the court found it unnecessary to pass upon the question considered below, namely, whether a federal court in one state will enforce the revenue laws of another state.

Another case from the same court is New York Trust Co. v. Island Oil & Transport Corporation et al., 1926, 11 Fed. (2d) 698. In that case receivers for the Island Oil & Transport Corporation petitioned the court for instructions as to whether or not they should pay an annual franchise tax due the State of Virginia. The district court held that the tax should be paid, but the Court of Appeals reversed this ruling, and held that there was no legal duty to pay the tax, and that it would be inexpedient to pay it as a matter of comity, since the money equitably belonged to the creditors. The opinion further stated that had Virginia appeared in the case and demanded payment, it could not have recovered because ''neither its sovereignty nor its statutes has any extra-territorial vigor.''

The exact point has never been decided by the Supreme Court of the United States. However, that court has held that a tax judgment of one state must be given full faith and credit in the courts of other states. This was held in Milwaukee County v. M. E. White Co. (1935), 296 U. S. 268, 56 S. Ct. 229, 80 L. Ed. 220. In that case a municipal corporation of Wisconsin assessed taxes against an Illinois corporation for income earned in Wisconsin. Judgment was recovered in Wisconsin on the assessment, but satisfaction was not obtained. Action was then brought on the judgment in the United States District Court in Illinois. The question of whether the federal courts of one state should entertain an action on a judgment of a court of another state founded on a tax claim was certified to the Supreme Court of the United States. The court gave an affirmative answer to the question. In passing upon the case, Mr. Justice Stone said:

''Even if the judgment is deemed to be colored by the nature of the obligation whose validity it establishes, and we are free to re-

examine it, and, if we find it to be based on an obligation penal in character, to refuse to enforce it outside the state where rendered (citing cases), still the obligation to pay taxes is not penal. It is a statutory liability, *quasi*-contractual in nature, enforceable, if there is no exclusive statutory remedy, in the civil courts by the common-law action of debt or indebitatus assumpsit.

* * * * *

"Whether one state must enforce the revenue laws of another remains an open question in this court. [See Moore v. Mitchell, 281 U. S. 18, 24, 50 S. Ct. 175, 74 L. Ed. 673.] But we do not stop to inquire whether the considerations which have been thought to preclude the enforcement of the penal laws of one state in the courts of another are applicable to taxing statutes; or whether the mere possibility of embarrassment in their enforcement should stay the hand of the court of another state in cases where in fact such embarrassment will not occur. For present purposes, we will assume that the courts of one state are not required to entertain a suit to recover taxes levied under the statutes of another, and confine our inquiry to the single question whether they must, nevertheless, give full faith and credit to judgments for such taxes.

* * * * *

"We can perceive no greater possibility of embarrassment in litigating the validity of a judgment for taxes and enforcing it than any other for the payment of money. The very purpose of the full-faith and credit clause was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin. That purpose ought not lightly to be set aside out of deference to a local policy which, if it exists, would seem to be too trivial to merit serious consideration when weighed against the policy of the constitutional provision and the interest of the state whose judgment is challenged. In the circumstances here disclosed, no state can be said to have a legitimate policy against payment of its neighbor's taxes, the obligation of which has been judicially established by courts to whose judgments in practically every other instance it must give full faith and credit.

* * * * *

"We conclude that a judgment is not to be denied full faith and credit in state and federal courts merely because it is for taxes."

From the foregoing cases, it will be seen that the doctrine promulgated by Lord Hardwicke and Lord Mansfield has been applied to situations far beyond the probable anticipation of those learned judges. The dogmatic rule that "one state does not enforce penal

or revenue laws of another state'' did not originate with cases involving an attempt to collect a tax, but had its inception in cases raising the question of whether a contract which did not comply with the revenue laws of the place where made was enforceable in the courts of the forum. Considerations of commercial convenience led to its adoption. The next step was to apply it to suits brought to collect a tax, but, in doing so, the courts have, except in the concurring opinion of Judge Hand in Moore v. Mitchell, *supra*, merely repeated the time-worn axiom, without considering whether the reasons which made it desirable to apply it to the early cases were applicable to the new situation presented.

The decisions mentioned put revenue laws in the same category as penal laws. This, in our opinion, is not proper. And this is also the view of the Supreme Court of the United States in the recent case of Milwaukee County v. M. E. White Co., *supra*.

Revenue laws are similar to penal laws only in the sense that they are both state regulations of a civic duty, but intrinsically they are different. A penal law is punitive in nature, while a revenue law defines the extent of the citizen's pecuniary obligation to the state, and provides a remedy for its collection. We will not exclude a suit to enforce a revenue law unless the considerations which have been thought to preclude the enforcement of penal laws are applicable to taxing statutes.

Numerous reasons are given for the rule that foreign penal laws will not be enforced. We shall briefly review them and determine whether they also are valid reasons for refusing our courts to the enforcement of foreign tax laws.

The foremost reason given for refusal to enforce foreign penal laws is the sovereign nature of independent states and the fear that the enforcement of penal laws of another state would be considered an interference with the prerogatives of that state, which might produce disagreeable international complications. This is a sound reason where the purpose of the law is to punish an offense against public justice, but it lends no support to a rule excluding the foreign state from seeking relief in a local forum for the collection of a tax due it, for the obvious reason that the foreign state is the one that wants to sue. It could not be considered an unwarranted interference with the prerogatives of the foreign state when that state is the motivating party asking for relief and undertaking to submit itself to the jurisdiction of the sister state.

Nor would a holding that a given foreign tax statute was invalid tend any more to the production of ill feeling than a refusal to permit an action at all. At any rate, in the American Union it would hardly lead to interstate complications of a serious nature. Such a possibility is so insignificent that it can very well be disregarded.

Penal laws are also excluded on the ground of procedural difficulties, such as the non-availability at the forum of a remedy by which relief, may be granted equivalent to that offered by the foreign state. In respect to the matter involved in the case at bar no such difficulty arises: The Oklahoma Statute, Section 1464, Title 68, Oklahoma Statutes, 1941, provides that a suit for taxes may be brought by the Oklahoma Tax Commission in any court of competent jurisdiction in the same manner as for the enforcement of a right of action for debt.

Another reason why foreign penal laws are regarded as unenforceable outside of the state which enacts them is the idea that punishment by a state whose laws have not been violated is inconsistent with the theory of retributive justice, which historically has been the underlying reason for the enactment and enforcement of penal laws. In other words, one state should not seek revenge for a violation of the law of a foreign state. This has no application to revenue laws. Tax laws are not passed to punish people.

Nor can it be said that Missouri has a local public policy opposed to the imposition of an income tax, which would prompt our courts to refuse enforcement of the Oklahoma tax.

It is also said that foreign penal laws will not be enforced because of the inconvenience to the defendant in being compelled to conduct his defense outside the jurisdiction where the acts giving rise to the claim for penalty took place, and the difficulty of proving facts at a distance from the place of their origin. These are practical inconveniences that are as applicable to tax suits as to suits to enforce a penalty. But, they are inconveniences which are common to all transitory civil actions, and have never been considered as a reason to bar them. It must also be remembered that in cases of this character the above-mentioned inconveniences are brought about by the taxpayer's removal from the taxing state, and by his refusal to make himself or his property available there. We see no reason why a different rule should obtain in this kind of action than in other civil actions. If it should appear, however, that relief could be obtained in the foreign state, we would perhaps be justified in applying the doctrine of *forum non conveniens,* and excluding the action.

Another reason for excluding suits to enforce penal laws is the inconvenience to the enforcing state in the way of added expense of conducting the trials and enforcing the judgments. This is an objection that is also applicable to suits to enforce foreign revenue laws. However, we are not convinced that it would become an intolerable burden upon the state. If experience should demonstrate otherwise, the situation could be remedied by the Legislature forbidding such suits.

Another reason for the refusal of a state to enforce foreign penal laws which are criminal in their nature is the constitutional guar-

antee of the right of trial by jury in the vicinity of the offense. Of course, this reason does not exist with respect to revenue laws.

In our opinion, the elimination of the foregoing considerations, which are said to prompt courts to refuse to enforce foreign penal laws, as reasons for excluding suits of this kind, leaves no valid justification for not permitting a suit in this state for a tax lawfully levied by another. The simplest ideas of comity would seem to compel such a result, and modern conditions demand it. The contrary doctrine was the product of the commercial world, and arose at a time when there was great commercial rivalry and international suspicion. It was applied as between wholly sovereign states. It has no place in a union of states such as the United States, where the interest of both the state and taxpayer will be protected from arbitrary power by the provisions of the federal constitution. The taxpayer who enjoys the protection of government should bear his share of the expense of maintaining the government, and should not be permitted to escape his obligation by crossing state lines.

The State of North Carolina has allowed recovery in such a case, in J. A. Holshouser Company and others against Gold Hill Copper Company, 1905, 138 N. C. 248, 50 S. E. 650. In that case defendant copper company was a New Jersey corporation doing its principal busines in North Carolina. Under the statutes of New Jersey, every corporation chartered by that state was required to pay an annual franchise tax. The statute further provided that the tax should be a debt due the state, and that an action at law could be maintained to collect it after it had been in arrears for one month, and that it should be a preferred debt in the event of insolvency. The copper company became in arrears to the State of New Jersey for three years' tax, in the amount of $12,000. A receiver was appointed in North Carolina, and the State of New Jersey filed a claim for the tax due, and asked for a preference. The Supreme Court of North Carolina held that New Jersey was entitled as a creditor to file the claim, but was not entitled to a preference. The statutory provision as to preference was held to have no extra-territorial force on the ground that it would prejudice local creditors.

Holding the views herein expressed, we believe that the trial court was in error in sustaining the demurrer to the petition.

The judgment appealed from is reversed, and the cause is remanded for further proceedings in accordance with the views herein expressed. *Hughes, P. J.,* and *McCullen, J.,* concur.