ROMANUS J. BUCKLEY, PLAINTIFF-APPELLANT, v. FULTON B. HUSTON, DEFENDANT-RESPONDENT.

Argued April 10 1972—Decided May 22, 1972.

*Mr. Albert J. Persichetti,* Deputy City Solicitor of Philadelphia, and a member of the Pennsylvania bar, argued the cause for the appellant (*Messrs. Tort and Daniels,* attorneys).

*Mr. Martin F. McKernan* argued the cause for the respondent (*Mr. Martin F. McKernan, Jr.,* on the brief).

The opinion of the Court was delivered by

JACOBS, J. The plaintiff, as Revenue Commissioner of the Department of Collections of the City of Philadelphia, brought an action in the Law Division of our Superior Court to recover wage taxes due to Philadelphia from the defendant who had been employed at the Frankford Arsenal in Philadelphia from 1943 through 1966. See *Application of Thompson,* 157 *F. Supp.* 93 (*E. D. Pa.* 1957), *aff'd,* 258 *F.* 2d 320 (3 *Cir.* 1958), *cert. denied,* 358 *U. S.* 931, 79 *S. Ct.* 317, 3 *L. Ed.* 2d 303 (1959); *Consolidation Coal Company v. Bailey,* 330 *F. Supp.* 474, 475 (*W. D. Pa.* 1971). The matter was transferred to the Atlantic County District Court which entered judgment for the defendant and this was

affirmed by the Appellate Division. 115 *N. J. Super.* 367 (1971). We granted certification on the plaintiff's application. 59 *N. J.* 292 (1971).

There is much discussion in legal publications as to whether the courts of a state may and should entertain actions seeking to collect tax claims due to sister states or their political subdivisions. See Robertson, "Extraterritorial Enforcement of Tax Obligations," 7 *Ariz. L. Rev.* 219 (1966); Goldstein, "Interstate Enforcement of Tax Laws of Sister States," 30 *Taxes* 247 (1952); Leflar, "Extrastate Enforcement of Penal and Governmental Claims," 46 *Harv. L. Rev.* 193 (1932); Note, "Extraterritorial Enforcement of Tax Claims," 12 *Wm. & Mary L. Rev.* 111 (1970); *Restatement (Second) Conflict of Laws* § 89, at 266 (1971). The English cases which gave rise to the early American common law notion that one state would not enforce the revenue laws of another, arose in international commercial contexts which have no relation whatever to the context at hand. Thus *Boucher v. Lawson,* 95 *Eng. Rep.* 53 (*K. B.* 1734), involved an action for nondelivery of gold which had been shipped from Portugal in violation of its exporting restrictions. The action was held maintainable with Lord Hardwicke stressing that enforcement of Portugal's exporting restrictions "would be of very bad consequence to the principal and most beneficial branches of our trade" (95 *Eng. Rep.* at 56). In *Holman v. Johnson,* 98 *Eng. Rep.* 1120, 1121 (*K. B.* 1775), Lord Mansfield remarked that "no country ever takes notice of the revenue laws of another" but his remark came in an action to recover the purchase price of tea lawfully sold by the plaintiff in France to the defendant who intended to smuggle it into England. Shortly thereafter the quoted remark was repeated in *Planche v. Fletcher,* 99 *Eng. Rep.* 164, 165 (*K. B.* 1779), where the plaintiffs sued to recover insurance for the loss of goods which had been placed on board a ship bound for France but diverted to Belgium for its lower duties. By 1823 Abbott, C. J. was able to say in *James v. Catherwood,* 3 *Dowl. & Ry.* 165 (*K. B.*), that

it was considered settled that a British court "cannot take notice of the revenue laws of a foreign state" although the only reason he gave was the "inconvenience" of examining into the foreign law; but that reason would equally preclude recognition of foreign nonrevenue as well as revenue law. *Cf. Adams v. National Bank of Greece* [1959] 2 *All E. R.* 362, 369 (*C. A.*).

Relying entirely on the doctrine that foreign revenue laws would not be noticed, the courts in *Municipal Council of Sydney v. Bull,* [1909] 1 *K. B.* 7 and *In re Visser,* [1928] *Ch.* 877, declined to entertain actions seeking to recover taxes and assessments imposed by foreign law. In *Bull* the City of Sydney in New South Wales brought an action in England to recover local property assessments due from the defendant. Grantham, J. described the proceeding as "analogous to an action brought in one country to enforce the revenue laws of another"; he held that such an action "will not lie outside the confines of the last mentioned State." 1 *K. B.* at 12. In *Visser* the court relied on *Bull* to support its holding that the Queen of Holland could not maintain an action in an English court to recover taxes due from the estate of a deceased subject of Holland. Neither decision embodied any discussion of the pertinent policy considerations and each may be viewed as broadly extending the early judicial expressions in international commercial contexts to the current tax context. See Mann, "Foreign Revenue Laws and the English Conflict of Laws," 3 *Int'l. & Comp. L. Q.* 465 (1954) where the author, in commenting on a Scottish decision (*Att-Gen. for Canada v. William Schulze & Co.* (1901) 9 *S. L. T.* 4) which had declined to entertain a foreign tax claim though it had been reduced to judgment, noted (at 471–72) that while in theory the result was harmonious with the general refusal of the English courts to entertain foreign governmental claims "in practice a rule which encourages tax evasion appears discreditable."

The early decisions in the United States embraced the English expressions without discussion. Thus in *Ludlow v. Van*

*Rensselaer,* 1 *Johns* 94 (*N. Y.* 1806), the plaintiff was permitted to recover on a note made in France but not having the stamp required by French law; Justice Livingston stated that the absence of the stamp was immaterial since "we do not sit here to enforce the revenue laws of other countries." In *Henry v. Sargeant,* 13 *N. H.* 321 (1843), the plaintiff brought an action in New Hampshire against the defendants who were selectmen of Chester, Vermont. He alleged that he had been improperly taxed and imprisoned in Vermont. In rejecting the defendants' contention that the New Hampshire court should not take jurisdiction since the revenue laws of Vermont were involved, the court noted that there was no attempt by the plaintiff's action to enforce Vermont's penal or revenue laws. However, in a dictum it stated without citation or elaboration that if the action had involved an attempt to collect a tax assessed in Vermont it would not be maintainable in New Hampshire. 13 *N. H.* at 332. Later cases, notably in New York (*Colorado v. Harbeck,* 232 *N. Y.* 71, 133 *N. E.* 357 (1921)), reasserted this dictum although again without any evaluation of the policy factors. See 3 *Beale, Conflict of Laws* § 610.2 (1935); *cf. Moore v. Mitchell,* 30 *F. 2d* 600, 603–604 (2 *Cir.* 1929) (concurring opinion), *aff'd,* 281 *U. S.* 18, 50 *S. Ct.* 175, 74 *L. Ed.* 673 (1930).

In *State v. Rodgers,* 238 *Mo. App.* 1115, 193 *S. W. 2d* 919 (*Ct. App.* 1946), we find, for the first time, a full examination of the underpinnings of the prohibition against actions on foreign tax claims. Judge Anderson pointed out that the English precedents furnished no sound base and that the American precedents had relied on them without any independent evaluation. He noted that in *Milwaukee County v. White Co.,* 296 U. S. 268, 56 *S. Ct.* 229, 80 *L. Ed.* 220 (1935), the Court had held that a state must give full faith and credit to another state's judgement for income taxes and that the Court had given strong indications favoring the liberal enforcement of such foreign tax claims which it viewed as statutory obligations, perhaps quasi-contrac-

tual in nature, but certainly "not penal." 296 *U. S.* at 271, 56 *S. Ct.* 229, 80 *L. Ed.* at 224; see *Huntington v. Attrill,* 146 *U. S.* 657, 13 *S. Ct.* 224, 36 *L. Ed.* 1123 (1892); Note, 29 *Colum. L. Rev.* 782, 786 (1929); see also *Goldstein, supra,* 30 *Taxes* at 251.

The court in *Rodgers* flatly upheld the right of Oklahoma to bring an action in Missouri to collect income tax obligations incurred by the defendants while they were residents of Oklahoma; it found no "local public policy" which would prompt the Missouri court to refuse enforcement of the Oklahoma tax; and it found no inconveniences attending the action beyond those which are "common to all transitory civil actions, and have never been considered as a reason to bar them." 193 *S. W. 2d* at 927. *Rodgers* has received the virtually unanimous approval of the commentators and has been followed in many cases throughout the country. See *Ohio v. Arnett,* 314 *Ky.* 403, 234 *S. W. 2d* 722, 725–727 (1950); *State v. Neely,* 225 *Ark.* 230, 282 *S. W. 2d* 150 (1955); *Detroit v. Gould,* 12 *Ill. 2d* 297, 146 *N. E. 2d* 61 (1957); *State Tax Comm'n. v. Cord,* 81 *Nev.* 403, 404 *P. 2d* 422 (1965); *Nelson v. Minnesota Income Tax Div.,* 429 *P. 2d* 324, 325 (*Wyo. Sup. Ct.* 1967); *Leflar, American Conflicts Law* § 270, at 641–43 (1968); *Goodrich, Conflict of Laws (Scoles Ed.* 1964) § 66, at 99–100; *Ehrensweig, Conflict of Laws* § 49, at 174 (1962).

There is no reason to doubt that New Jersey's common law is now firmly in accord with the holding in *Rodgers.* See *Pennhurst State School v. Estate of Goodhartz,* 42 *N. J.* 266, 272 (1964); *State v. Amsted Industries,* 48 *N. J.* 544, 549 (1967); cf. *Standard, &c., Co. v. American Salpa Corp.,* 113 *N. J. Eq.* 468 (*Ch.* 1933); *New York v. Coe Mfg. Co.,* 112 *N. J. L.* 536 (*E. & A.*), *cert. denied,* 293 *U. S.* 576, 55 *S. Ct.* 89, 79 *L. Ed.* 674 (1934). In *American Salpa* Delaware was permitted to recover a franchise tax in a New Jersey receivership proceeding and in *Coe Mfg.* New York was permitted to recover a franchise tax which it had imposed on a New Jersey corporation and which it had pur-

sued to judgment in New York. Justice Lloyd noted that while New Jersey would not enforce foreign penal actions, New York's franchise tax was not penal in nature (112 *N. J. L.* at 538) ; he expressed the view that barring actions such as that instituted by New York would subject it to "grave wrongs." 112 *N. J. L.* at 540. See *Terenzio v. Nelson,* 107 *N. J. Super.* 223, 227–28 *(App. Div.* 1969) ; "Tax Comity," 25 *Corp. J.* 99 (1967).

*Pennhurst State School v. Estate of Goodhartz, supra,* 42 *N. J.* 266, upheld the right of Pennsylvania to maintain an action in a New Jersey court against a New Jersey estate to recover the cost of caring for the decedent's incompetent son in a Pennsylvania State institution. In the course of our opinion we pointed out that :

There is no sensible basis for declining to entertain the plaintiff's action in our courts for we have long become accustomed to the enforcement of rights created by foreign states which are neither penal in nature nor offensive to our policy. See *Giardini v. McAdoo,* 93 *N. J. L.* 138 (E. & A. 1919) ; *Masci v. Young,* 109 *N. J. L.* 453 (E. & A. 1932)·, *aff'd,* 289 *U. S.* 253, 53 S. Ct. 599, 77 L. Ed. 1158 (1933) ; *Marshall v. Geo. M. Brewster & Son, Inc.,* 37 N. J. 176 (1962) ; *cf. Zurich General Accident, &c., Co. v. Ackerman Bros., Inc.,* 124 *N. J. L.* 187 (E. & A. 1940). 42 *N. J.* at 271.

In *Pennhurst* we cited *Rodgers* and explicitly accepted the reasons which it advanced in support of the extraterritorial enforcement of ordinary tax claims; such claims are not penal· in nature and are consistent with local policy; their enforcement entails no procedural or governmental obstacles and advances the interests of comity between the states; they generally do not involve any incidents of *forum non conveniens* and, if an exceptional situation does arise where such incidents are present, the cause may be remitted to the more convenient forum. 42 *N. J.* at 272. In *Amsled* we recently reaffirmed *Pennhurst* and indicated that we would recognize actions under foreign escheat laws, noting that "escheat laws are not penal and do not offend any policy of our State." 48 *N. J.* at 549.

Professor Leflar appropriately points out that tax burdens are tolerable only so long as they are fairly shared and that "sympathy for those who seek to avoid payment of their taxes by slipping across state lines cannot stand up under intelligent analysis." *Leflar, American Conflicts Law, supra,* at 642. He expects that earlier hostilities to foreign tax claims will shortly have been dissipated throughout all the states either by reciprocal legislation or by common law decision. While reciprocity is not a condition of our common law decision (*cf.* Robertson, *supra, 7 Ariz. L. Rev.* at 243), we do note that Pennsylvania has by legislation broadly provided that its courts shall recognize and enforce tax liabilities imposed by "any other state or any political subdivision thereof" which extends a like comity to Pennsylvania and any political subdivision. 12 *Purdon's Pa. Stat. Ann.* § 1292 (Act of August 14, 1963, P. L. 1052).

New Jersey has no general tax reciprocity legislation but has Acts containing particularized tax reciprocity provisions. See *N. J. S. A.* 54:8A–46; *N. J. S. A.* 54:32B–23. One of these, enacted by *L.* 1962, *c.* 70 as an amendment to the Emergency Transportation Act (*L.* 1961, *c.* 32), provides that the Attorney General may bring suit in the appropriate court of any other state to collect any tax due under that Act; it further provides that the courts of our State shall recognize and enforce liabilities "for taxes lawfully imposed by any other State, upon incomes" which extends a like comity to New Jersey. *L.* 1962, *c.* 70, at 293. *N. J. S. A.* 54:8A–46. The Appellate Division found that this dealt only with foreign "State" taxes, namely those "imposed by the legislature of another state, assessed and collected by state officials and deposited into the general state treasury for use as appropriated by the legislature." 115 *N. J. Super.* at 371; *cf. State of Illinois v. City of Milwaukee,* 404 *U. S.* ——, 92 *S. Ct.* 1385, 31 *L. Ed. 2d* 712 (U. S. 1972). In the light of the legislative history outlined by the Appellate Division we do not differ with the aforementioned conclusion; however, we firmly differ with the Ap-

pellate Division's further conclusion that by the enactment of *L.* 1962, *c.* 70, the Legislature preempted the field of tax reciprocity "both affirmatively and negatively" (115 *N. J. Super.* at 373) and thereby nullified our common law principle under which Philadelphia may maintain an action in our courts to collect taxes lawfully imposed by it on the defendant and now owing by him.

For present purposes we may bypass any question as to the constitutional power of the Legislature to prohibit our Superior Court from entertaining actions to recover foreign municipal taxes (*cf. art.* VI, § 3, para. 2) for we find nothing whatever in the history, terms or purposes of the legislation which evidences a prohibitory intent. The Legislature undoubtedly adopted the reciprocal provision in *L.* 1962, *c.* 70 with a view towards strengthening the Attorney General's hand in asserting New Jersey's right to maintain actions in foreign states for State taxes due under the Emergency Transportation Act; but that does not even remotely suggest an accompanying intent to curb existing common law rights in our courts. There is no express language evidencing such a negative intent nor is it to be implied under construction principles. *Cf. State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 486, *appeal dismissed,* 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1953) ; *State v. Loog,* 13 *N. J. Misc.* 536, 541 (*Sup. Ct.* 1935), *aff'd sub nom., State v. Henry,* 117 *N. J. L.* 442 (*E. & A.* 1937) ; *Hetfield v. The Central Railroad Co.,* 29 *N. J. L.* 571, 573 (*E. & A.* 1862) ; *State v. Norton, et al.,* 23 *N. J. L.* 33, 40 (Sup. Ct. 1850).

In *Western Union* Justice Wachenfeld referred to the traditional interpretative rule under which statutes containing no "negative or exclusive words" are generally held not to abrogate the common law. In the course of his opinion (12 *N. J.* at 486) he reaffirmed the following early expressions found in *State v. Norton, et al., supra*:

When the common law and a statute differ, the common law gives place to the statute, only where the latter is couched in negative terms, or where its matter is so clearly repugnant that it necessarily implies

a negative. (1 *Black Com.* 89.) It is a rule of exposition that statutes are to be construed in reference to the principles of the common law, for it is not to be presumed that the legislature intended to make any innovation upon the common law further than the case absolutely required. The law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced, for if the parliament had had that design, it is naturally said they would have expressed it. *Dwarris on Stat.* 695. 23 *N. J. L.* at 40–41.

More modern expressions recognize that formal interpretative rules have only a subordinate bearing and that faithful statutory construction will turn not on them but on the "objectives of the legislation and the commonsense of the situation." *Motyka, et al v. McCorkle, et al.,* 58 *N. J.* 165, 176 (1971); *Levin v. Tp. Committee of Tp. of Bridgewater,* 57 *N. J.* 506, 515, *appeal dismissed,* 404 *U. S.* 803, 92 S. Ct. 58, 30 *L. Ed. 2d* 35 (1971). Here it seems clear that delimiting the common law was not one of the statutory objectives and that, sensibly, no such consequence is to be implied.

 We are entirely satisfied that the plaintiff has the common law right to proceed in our courts and that the Appellate Division erred in its holding that *L.* 1962, *c.* 70 (*N. J. S. A.* 54:8A–46) precludes its action. Although the plaintiff's complaint refers to the statute, the reference may be considered as surplusage and the action may now proceed under common law principles. The defendant may of course press any defenses he has on the ultimate merits although we note that his brief before us was confined to the jurisdictional issue which we have rejected and to claims addressed solely to the measure of plaintiff's recovery; these claims were grounded on (1) our statute of limitations (*N. J. S. A.* 2A:14–1) and (2) our prevailing doctrine that actions to recover foreign penalties as such are not maintainable. See *Derrickson v. Smith,* 27 *N. J. L.* 166 (*Sup. Ct.* 1858); *Restatement, supra,* § 89, at 264–67.

In *Pennhurst, supra,* we pointed out that "when a foreign state sues in the courts of our State it lays aside its sovereignty and is to be dealt with as a private suitor" (42 *N. J.*

at 273) ; *a fortiori* a foreign municipality, such as that represented by the plaintiff, is to be dealt with as a private suitor and is subject to the applicable provision in our statute of limitations. 42 *N. J.* at 273; see *Leflar, American Conflicts Law, supra,* at 303; *Goodrich, supra,* § 85, at 152–53; *Ehrensweig, supra,* § 37, at 130–33; *Restatement, supra,* § 142, at 396–99. Although the plaintiff's complaint includes a claim for penalties as such ( *cf. United States v. Childs,* 266 *U. S.* 304, 45 *S. Ct.* 110, 69 *L. Ed.* 299 (1924)) in addition to the tax and the interest due thereon, we have not been asked nor are we disposed to reject, at least in the circumstances presented by the instant matter ( *cf. In re Marino,* 23 *N. J. Misc.* 159, 166 ( *Ct. of C.P.* 1945)), the prevailing doctrine that foreign penalties as such are not recoverable. See *Nelson v. Minnesota Income Tax Div., supra,* 429 *P. 2d* 324, where the State of Minnesota instituted an action in the Wyoming court to collect a state income tax from the defendant on income earned in Minnesota while he was a resident of Minnesota prior to his moving to Wyoming. Adopting the views expressed in *Rodgers, supra,* 238 *Mo. App.* 1115, 193 *S. W. 2d* 919, the Wyoming court held that Minnesota's action was maintainable in Wyoming; however, it rejected Minnesota's claim for a penalty, noting that while it would as a matter of comity recognize Minnesota's right to recover taxes and interest it would not "as far as this particular case is concerned, extend the application of comity to an enforcement of the penalty provisions of Minnesota's tax code." 429 *P. 2d* at 325.

Reversed and remanded to the Atlantic County District Court for further proceedings in conformity with this opinion.

*For reversal and remandment*: Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*: None.