**UNITED STATES of America,
Appellee,**

v.

**FIRST NATIONAL CITY BANK,
Appellant,**

and

**Omar, S.A., a Uruguayan corporation, Lazard Freres & Co., Lehman Brothers, Belgian-American Banking Corp., Belgian-American Bank and Trust Co., and First National City Trust Co., Defendants.**

United States Court of Appeals
Second Circuit.

Argued April 11, 1963.

Decided June 26, 1963.

Henry Harfield of Shearman & Sterling, New York City (Herman E. Compter and John E. Hoffman, Jr., New York City, of counsel), for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen. (Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, Morton L. Ginsberg and Robert Arum, Asst. U. S. Attys., Harold C. Wilkenfeld, Michael A. Mulroney and John J. McCarthy, Attys., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

MOORE, Circuit Judge.

This appeal presents an important question concerning the scope of an injunction against an American bank affecting deposits that may be held for the credit of an alleged delinquent taxpayer in a branch bank outside of the United States.

The taxpayer involved is Omar, S.A., a Uruguayan corporation. An investigation into Omar's affairs in this country revealed the likelihood that Omar was indebted to the United States for unpaid taxes and that sometime in June, 1961, Omar commenced a program of liquidating its holdings of securities in this country and transferring the receipts to Uruguay.[1] On October 31, 1962, the Internal Revenue Commissioner caused the issuance of jeopardy assessments against the taxpayer for deficiencies in corporate income tax totalling about $19,300,000 for the fiscal years March 31, 1955, through 1961, inclusive. Notice of the assessment and demand for payment was sent to Omar.

On the same day the United States filed a complaint in the District Court for the Southern District of New York naming as defendants Omar, S.A.; two banks, The First National City Bank of New York and Belgian-American Banking Corp.; two brokerage houses, Lazard Freres & Co. and Lehman Bros.; and two trust companies, First National City Trust Co. and Belgian-American Bank & Trust Co. The complaint alleged that defendants, other than Omar, held sums for the account of or to the credit of Omar and prayed that the District Court adjudge Omar indebted to the government for unpaid taxes; find a valid lien existing in favor of the plaintiff on all property or rights to property belonging to the defendant Omar; enjoin the other

---

[1]. An affidavit submitted by John H. Walker, an employee of the Office of International Operations, Internal Revenue Service, states that an investigation of the records of Lazard Freres & Co. revealed that on June 23, 1961, Omar was paid $400,000 with the notation, "Pd Belgian American Banking Corp. a/c Baco Italo Belge Montevideo for your account" and on December 8, 1961, $1,640,000 was paid to Omar with the notation, "Transfer by wire to 1st National City Bank (ofn y (sic) Montevideo credit for your account." An affidavit submitted by Forrest J. Kern of the same office reveals a withdrawal from Omar's account with Lehman Brothers of $500,000 with the notation "check to 1st National City Bank."

defendants from in any way transferring or disposing of such property; order the return of all such property to the jurisdiction of the court; and order the foreclosure of plaintiff's lien on any such property held by defendants and its judicial sale. No personal jurisdiction has been obtained over the taxpayer Omar. An application for a temporary restraining order was granted on October 31, 1962, and on November 20, 1962, the district court, after hearing both sides, granted a preliminary injunction enjoining certain defendants from transferring or disposing of any property or rights to property, whether or not located within the United States, held for the account of Omar by defendants, their branches, agents or nominees.[2]

■■ Defendant First National City Bank of New York [hereinafter referred to as "Citibank"] appeals from so much of the order as applies to property or rights to property that it may hold in branch banks outside the United States.[3] Citibank's argument on appeal is that under New York law, a deposit in its branch bank would not be collectible by Omar in New York, Omar's sole right being against any branch bank in which such deposits have been made; that there being no debt in the United States, there is no property or right to property to which a federal lien can attach; and that the district court was without jurisdiction to issue an injunction affecting any such deposits. The Government in turn asserts that Citibank is itself the debtor and that a lien attached to this debt in New York; that the federal lien attached even if the situs of the debt be outside the United States; and that in any event, personal jurisdiction over Citibank was sufficient basis for the issuance of the injunction.

**I**

To put these contentions in their proper perspective, a short summary of the enforcement provisions of the Internal Revenue Code of 1954 and judicial decisions thereunder is appropriate. The Code provides several alternative methods for the collection of the revenue from those who neglect or refuse to pay.[4] Sections 6321 and 6332, 26 U.S.C., provide that a lien upon "all property and rights to property" belonging to a taxpayer who has refused or neglected to pay any tax

---

2. The defendants Belgian-American Banking Corp. and First National City Trust Co. filed uncontroverted affidavits alleging that they held no property or rights to property belonging to the taxpayer. Therefore, they were excluded from the order issued by the court.

3. Jurisdiction over this appeal from the granting of a preliminary injunction lies under 28 U.S.C. § 1292(1). In reviewing the preliminary injunction, this court may inquire into the jurisdiction of the district court as well as into the adequacy of the complaint for the injunction cannot stand if the complaint itself cannot stand. Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L. Ed. 189 (1940); John Hancock Mutual Life Ins. Co. v. Kraft, 200 F.2d 952 (2d Cir., 1953); Pang-Tsu Mow v. Republic of China, 91 U.S.App.D.C. 324, 201 F.2d 195 (D.C.Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953); Eighth Regional War Labor Board v. Humble Oil & Refining Co., 145 F.2d 462 (5th Cir., 1944), cert. denied, 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998 (1945).

4. The relevant sections provide:
    "§ 6321. *Lien for Taxes.*
    "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."
    "§ 6322. *Period of Lien.*
    "Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed is satisfied or becomes unenforceable by reason of lapse of time."
    "§ 6331. *Levy and Distraint.*
    "(a) Authority of Secretary or Delegate.—If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cov-

arises at the time an assessment is made. In addition, the Service is authorized to collect such tax by levy on all property or rights to property either belonging to the taxpayer or on which there is a lien. 26 U.S.C. § 6331(a). Any person in possession of property or rights to property on which a levy has been made who fails to surrender such property to the Service on demand is personally liable in a sum equal to the value of the property or rights not surrendered. 26 U.S.C. § 6332 (b).

The statutory scheme also provides for resort to the courts if necessary. Section 7403(a) permits the filing of a civil action in the district court to enforce a federal tax lien, whether or not levy has also been made. In addition, the district courts have jurisdiction to issue all orders or injunctions necessary or appropriate for the enforcement of the internal revenue laws. 26 U.S.C. § 7402(a).

The effect of the foregoing provisions is to create a statutory attachment or garnishment without requiring resort to the court processes normally necessary in ordinary garnishment proceedings. United States v. Eiland, 223 F.2d 118 (4th Cir., 1955). Where for some reason personal jurisdiction over the delinquent taxpayer is unobtainable, the Service is able to proceed in actions quasi in rem to enforce its lien on specific property belonging to the taxpayer within the jurisdiction of the court. See United States v. Balanovski, 236 F.2d 298 (2d Cir., 1956), cert. denied, 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 (1957).

The crucial question here is whether appellant holds property or rights to property of the taxpayer Omar

---

er the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax. * * * If the Secretary or his delegate makes a finding that the collection of such tax is in jeopardy, notice and demand for immediate payment of such tax may be made by the Secretary or his delegate and, upon failure or refusal to pay such tax, collection thereof by levy shall be lawful without regard to the 10-day period provided in this section."

"§ 6332. *Surrender of Property Subject to Levy.*

"(a) Requirement.—Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

"(b) Penalty for Violation.—Any person who fails or refuses to surrender as required by subsection (a) any property or rights to property, subject to levy, upon demand by the Secretary or his delegate, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the col-lection of which such levy has been made, together with costs and interest on such sum at the rate of 6 percent per annum from the date of such levy."

"§ 7402. *Jurisdiction of District Courts.*

"(a) To Issue Orders, Processes, and Judgments.—The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, and of ne exeat republica, orders appointing receivers, and such other orders and processes, and to render such judgment and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."

"§ 7403. *Action to Enforce Lien or to Subject Property to Payment of Tax.*

"(a) Filing.—In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title or interest, to the payment of such tax or liability."

subject to the jurisdiction of the district court.[5] The nature of Omar's right against Citibank arising out of a deposit made in Citibank's Montevideo branch bank is to be determined by state law for the tax lien statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed. 2d 1135 (1958); see Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); Raffaele v. Granger, 196 F.2d 620 (3d Cir., 1952).

■■ The proper place to sue to enforce a lien is in the district in which the property is located. United States v. Dallas National Bank, 152 F.2d 582 (5th Cir., 1945). Absent jurisdiction over the person of Omar, this action can proceed only on the ground that Citibank's debt to Omar is within the jurisdiction of the district court. Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1950), made explicit what had been assumed since Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565 (1877), namely, that a state has no right "to enter a judgment purporting to extinguish the interest of such a person [over whom it has no personal jurisdiction] in property over which the court has no jurisdiction." 357 U.S. at 250, 78 S.Ct. at 1237.

■ The Government argues that the situs of the debt is irrelevant because a bank account creates a debtor-creditor relationship which is subject to levy, United States v. Bowery Savings Bank, 297 F.2d 380 (2d Cir., 1961); United States v. Manufacturers Trust Co., 198 F.2d 366 (2d Cir., 1952); United States v. Third National Bank & Trust Co., 111 F.Supp. 152 (M.D.Pa.1953), and that, therefore, jurisdiction exists in the district court because the "obligation of the debtor to pay clings to and accompanies him wherever he goes." Harris v. Balk, 198 U.S. 215, 222, 25 S.Ct. 625, 626, 49 L.Ed. 1023 (1905). Although the Government correctly characterizes

the relationship between bank and depositor, its argument merely begs the determinative question, namely, who is the actual debtor in this case, the appellant or its branch banks. The nature of garnishment proceedings is such that the garnishor obtains no greater right against the garnishee than the garnishee's creditor had. Harris v. Balk, supra, 198 U.S. at 222; 25 S.Ct. at 626; Karno-Smith Co. v. Maloney, 112 F.2d 690, 692 (3d Cir., 1940); Wheeler v. Thomas, 31 F. Supp. 702 (D.C.D.C.1940). But cf. United States v. Manufacturers Trust Co., supra. Thus, only if Omar could sue appellant in New York to recover his deposit, can the Government, as Omar's creditor, sue in New York. Inquiry, therefore, must be made into the nature of the debt owed to Omar under state law.

A review of the New York cases indicates a consistent line of authority holding that accounts in a foreign branch bank are not subject to attachment or execution by the process of a New York court served in New York on a main office, branch or agency of the bank. See Comment, Garnishment of Branch Banks, 56 Mich.L.Rev., 90 (1957). This doctrine finds its inception in English law. An important case is Richardson v. Richardson & National Bank of India, Ltd., [1927] Probate 228, 137 L.T. R492, 163 L.T. 450, involving an attempt by a wife to obtain a garnishee order against the account of her husband in a bank whose head office was in London. The question presented was whether the garnishee order could extend to deposits to the husband's credit in branch banks in Kenya and Tanganyika. The Court, after reviewing prior English authorities such as Woodland v. Fear, 7 E. & B. 519 (1857) and Rex v. Lovitt, [1912] A.C. 212 (P.C.), found that the contractual obligation between bank and customer contains certain implied terms, these being that (1) the promise of the bank is to repay at the branch where the account is kept; and (2) the bank is not required to pay until payment is demanded at the branch

---

5. For the sake of brevity, future references in this opinion to "property belonging to the taxpayer" are to be taken to include "rights to property" as well.

where the account is kept. Therefore, since the debt of the bank at its main office did not extend to deposits in its branch banks, it was not property within the jurisdiction of the English court and was not subject to attachment there.

■■■■ An early case in New York Chrzanowska v. Corn Exchange Bank, 173 App.Div. 285, 159 N.Y.S. 385 (1st Dep't 1916), affirmed, 225 N.Y. 728, 122 N.E. 877 (1919), dealing with the relationship between branch banks, established the proposition that domestic branches within the same city were to be regarded as distinct and separate entities and that deposits made in branch banks are payable there and only there. The court said: "the different branches were as separate and distinct from one another as from any other bank." 173 App.Div. at 291, 159 N.Y.S. at 388. But see Konstantinidis v. The S. S. Tarsus, 196 F.Supp. 433 (E.D.N.Y.1961). This view was thereafter applied to foreign branches with respect to the collection of forwarded paper, the court stating that "the branch is not a mere 'teller's window'; it is a separate business entity." Pan-American Bank & Trust Co. v. National City Bank, 6 F.2d 762, 767 (2d Cir.), cert. denied 269 U.S. 554, 46 S.Ct. 18, 70 L.Ed. 408 (1925). Furthermore, the contract between the bank and a depositor in a foreign branch is to pay in the currency of the branch in which the deposit is made. Sokoloff v. National City Bank, 250 N.Y. 69, 164 N.E. 745 (1928); Zimmerman v. Hicks, 7 F.2d 443 (2d Cir., 1925), affirmed sub nom. Zimmermann v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1926). The separate entity theory is subject only to the exception that if the branch be closed or if demand for payment is refused at the branch, an action against the main office will lie. Sokoloff v. National City Bank, 239 N.Y. 158, 145 N.E. 917, 37 A.L.R. 712 (1924); Richardson v. Richardson & National Bank of India, Ltd., supra.[6]

Bluebird Undergarment Corp. v. Gomez, 139 Misc. 742, 249 N.Y.S. 319 (City Ct., N.Y.Cty.1931), dealt with the scope of a warrant of attachment served on the main office of a bank located in New York involving an account of a defendant outside the United States. The issue arose on a motion to compel the bank to produce information showing whether the defendant had any sums on account in the bank's Puerto Rico branch. Relying on the separate entity theory espoused in Richardson and Chrzanowska, the court found that the defendant could not have commenced an action in New York to recover his deposit in Puerto Rico. The court in its opinion said:

> "Not only are branch banks separate entities, but deposits made in a branch bank are payable there and there only * * *. A branch bank being separately indebted to its depositor, the existing obligation lies primarily between such branch bank and its depositor. The conclusion follows as a necessary corollary that the debt owed by a branch finds its situs within the territorial jurisdiction of such branch."

139 Misc. at 744, 249 N.Y.S. at 321–22. See also Philipp v. Chase National Bank, 34 N.Y.S.2d 465 (Sup.Ct., N.Y.Cty.1942); Walsh v. Bustos, 46 N.Y.S.2d 240 (City Ct., N.Y.Cty.1943).

In Clinton Trust Co. v. Compania Azucarera Central Mabay S.A., 172 Misc. 148, 14 N.Y.S.2d 743 (Sup.Ct., N.Y.Cty., affirmed without opinion, 258 App.Div. 780, 15 N.Y.S.2d 721 (1st Dep't 1939)), the court was faced with an application to direct Chase National Bank and the Royal Bank of Canada to answer certain questions concerning the status of deposit accounts of the defendant in their branch banks in Havana, Cuba. In denying the application, the court relied on the authorities already discussed, but found additional support for its conclusion with

6. For a discussion of the legal problems arising out of the growth of branch banking, see Fordham, Branch Banks as Separate Entities, 31 Colum.L.Rev. 975 (1931).

respect to Chase in 12 U.S.C. § 604. That section provides that:

> "Every national banking association operating foreign branches shall conduct the accounts of each foreign branch independently of the accounts of other foreign branches established by it and of its home office, and shall at the end of each fiscal period transfer to its general ledger the profit or loss accrued at each branch as a separate item."

See also Pan-American Bank & Trust Co. v. National City Bank, supra.

Later cases in New York, while still resting on the separate entity theory, have stressed the policy justifications underlying the rule. In Cronan v. Schilling, 100 N.Y.S.2d 474, 476 (Sup.Ct., N.Y.Cty. 1950), the Court stated:

> "Unless each branch of a bank is treated as a separate entity for attachment purposes, no branch could safely pay a check drawn by its depositor without checking with all other branches and the main office to make sure that no warrant of attachment had been served upon any of them. Each time a warrant of attachment is served upon one branch, every other branch and the main office would have to be notified. This would place an intolerable burden upon banking and commerce, particularly where the branches are numerous, as is often the case."

Similarly in Newtown Jackson Co. v. Animashaun, 148 N.Y.S.2d 66 (Sup.Ct., Nassau Cty.1955), the court found that the rule rested on two grounds: (1) the situs of the debt is at the branch where the account is carried; (2) the crippling effect a contrary rule would have on banking practice involving branch banks in distant corners of the globe.

Most recently, the rule has received the sanction of the New York Court of Appeals in McCloskey v. Chase Manhattan Bank, 11 N.Y.2d 936, 228 N.Y.S.2d 825, 183 N.E.2d 227 (1962), which was an action to recover (by attachment) in New York moneys payable at a branch of the New York bank in Germany. The funds were held not to be subject to New York attachment. The Court of Appeals, without opinion, affirmed the judgment granting defendant's motion to dismiss the complaint.

The Government seeks to vitiate the effect of these cases by contending that they relate merely to state-imposed restrictions upon the remedy of a creditor of a depositor, stressing the fact that none of these cases involved an actual attempt by a depositor to demand payment in New York of a deposit made in a branch bank abroad.[7] Relying on United States v. Bess, supra, it argues that state-created restrictions on enforcement remedies are inoperative to prevent the attachment or enforcement of federal tax liens.[8]

---

**7.** Varga v. Credit-Suisse, 2 A.D.2d 596, 157 N.Y.S.2d 391 (1st Dep't 1956) is urged by the Government as authority for the proposition that a depositor may sue a New York branch of a foreign bank with respect to an account in another foreign branch of the bank. However, that case involved a suit for breach of contract arising out of the alleged wrongful transfer of funds deposited in a Hungarian branch. The sole question decided there was that § 200, subd. 3 of the New York Banking Law, did not prevent a suit against an agent of a foreign bank in New York where the cause of action arose outside of New York. In addition, although the question was not reached by the court, it is possible that the action might be governed by the rule of Sokoloff

v. National City Bank, 239 N.Y. 158, 145 N.E. 917, 37 A.L.R. 712 (1924), which permitted an action against the main office where payment had been refused at a branch office. Here, since the funds had allegedly been transferred, no demand would even be necessary. Cf. Sokoloff v. National City Bank, 250 N.Y. 69, 80–81, 164 N.E. 745, 749 (1928).

**8.** In Bess, after holding that the federal lien did not attach to the proceeds of an insurance policy on the life of the insured but only to the cash surrender value of the policy, the Court rejected the contention that no federal lien attached to the cash surrender value because under state law that property right was not subject to creditors' liens. Once it was deter-

This argument fails to recognize the full import of the New York cases. The reason that attachment fails is in no way due to any peculiar vagaries in the attachment remedy itself; rather, it is the result of the New York substantive rule that there is no obligation due at the main branch to a depositor in another branch and, therefore, no property subject to attachment within the jurisdiction of the New York courts.[9] Furthermore, the policy justifications offered to support the rule rest not on the inappropriateness of attachment as a remedy, but on the more fundamental notion that to require any branch to respond to the demand of a depositor in another branch anywhere in the world would impose an intolerable burden on the banking community. This would be the result of not only the impracticality of requiring constant transmission of reports on the status of accounts in one branch to all other branches, but on the complications that arise out of the fact that different branches may be subject to the laws of other countries and may be dealing in different currencies.[10]

The Government also places some reliance on the rejection of the separate entity theory, based on 12 U.S.C. § 604, in First National City Bank v. Internal Revenue Service, 271 F.2d 616 (2d Cir., 1959). There this Court held that this section was not a bar to requiring the bank to produce bank records, physically located in its branch bank in Panama, relating to an account of a Panama corporation. There are two ready answers to this contention. In the first place, in only one New York case has there even been partial reliance on 12 U.S.C. § 604. See Clinton Trust Co. v. Compania Azucarera Central Mabay S. A., supra. Secondly, First National City did not reject the separate entity theory for all purposes and under all circumstances. Thus, this Court there recognized that a prior decision in this Circuit, Pan-American Bank & Trust Co. v. National City Bank, supra, which relied in part on § 604, had held that "in various commercial transactions between a branch bank and its home office the rights involved are to be determined as though the branch was acting at arm's length as an independent entity." First National City Bank v. Internal Revenue Service, supra, 271 F.2d at 619. The court in no way intimated disapproval of the Pan-American opinion; it merely found that the case at bar, involving a question of whether the main office had sufficient control over its branch to order the return of certain records for

---

mined under state law that a property right existed in the insured taxpayer, the state attachment law became irrelevant.

9. Further support for this conclusion can be garnered from the refusal of the New York courts to extend § 916(3) of the New York Civil Practice Act to these cases. See Cronan v. Schilling, 100 N.Y. S.2d 474 (Sup.Ct., N.Y.Cty.1950); Casenote, Branch Banking as Separate Entity for Attachment Purposes, 48 Cornell L.Q. 333 (1963). That section provides for attachment upon:

"A debt, arising under or on account of a contract * * * due * * * to a resident or non-resident person or corporation, from a resident or non-resident person or corporation, upon whom or which service of process may be had within the county, provided that an action could be maintained by the defendant within the state for the recovery of such debt at the maturity thereof or where the debt consists of a deposit of money not to be repaid at

a fixed time but only upon a special demand, that such demand therefor could be duly made by defendant within the state."

If the substantive law of the state were, as the Government urges that a depositor in a foreign branch could demand payment at a New York branch, then § 916 (3) by its terms would be applicable to the case of attachment by a creditor of the depositor. The section is, however, inapplicable only because the state rule is that a depositor could not successfully demand payment in New York.

10. Problems arising out of the fact that different branches deal with different currencies include questions of the possible necessity of securing a license in order to convert the foreign currency into American dollars, the effective date for determination of the rate of exchange and the selection of the proper exchange rate when multiple exchange rates are in force.

examination, was distinguishable from the arm's length transaction in Pan-American.

## II

The court below rested its decision to issue the injunction on the grounds that the court having personal jurisdiction over Citibank, it had the power to compel the performance of acts respecting property situated outside its jurisdiction. The district court relied on cases sustaining the power of the district court to require the production of records held in branch banks pursuant to a summons served upon its home office.[11] First National City Bank v. Internal Revenue Service, supra; Application of Chase Manhattan Bank, 297 F.2d 611 (2d Cir., 1962). But cf. Ings v. Ferguson, 282 F.2d 149, 82 A.L.R.2d 1397 (2d Cir., 1960). Furthermore, in United States v. Ross, 302 F.2d 831 (2d Cir., 1962) the power of a district court to order the taxpayer, over whom personal jurisdiction had been obtained, to transfer stock certificates, located in the Bahamas, to a receiver appointed by the district court, was upheld. See also S. E. C. v. Minas De Artemisa, S.A., 150 F.2d 215 (9th Cir., 1945).

Here, however, the absence of personal jurisdiction over the taxpayer Omar is a crucial factor in distinguishing the Ross case. Since Omar was not before the court, no personal judgment could have been rendered against it. Only a judgment *quasi in rem* extinguishing Omar's rights in any property it might have within the district court's jurisdiction would be valid. A prerequisite to such jurisdiction must be power over the *res*. Hanson v. Denckla, supra.

Although Citibank might be liable personally for wrongfully refusing to surrender property on which the Government holds a lien, 26 U.S.C. § 6332, any such action would have to be predicated on the existence of a valid lien. See 26 U.S.C. § 7403. Since the property is without the United States, no valid lien ever attached.

The Government, however, asserts that the words of the tax lien statute, 26 U.S.C. § 6321, have a global application and that the lien attaches to property of the taxpayer anywhere in the world. If taken literally, the statute might be susceptible to this interpretation, but to so construe it would do violence to the settled principle of statutory construction that legislation is meant to apply only within the territorial jurisdiction of the United States unless a contrary intention appears. Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252, 76 L.Ed. 375 (1932); Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); Lauritzen v. Larsen, 345 U.S. 571, 577, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). The Supreme Court has made manifest its reluctance to read an extraterritorial force into statutes when to do so would extend coverage beyond places over which the United States has legislative control, Foley Bros., Inc. v. Filardo, supra, or would interfere with the rights of other nations, Lauritzen v. Larsen, supra.

It has long been a general rule that one sovereignty may not maintain an action in the courts of another state

11. A recurring problem in these cases is the effect that is to be given to the fact that compliance with the production order may subject the party or witness to civil liability or criminal penalties under the law of the country in which the records are located. Under these circumstances, the burden of proceeding by appropriate process in the courts of the foreign country shifts to the party seeking production, with some vague duty on the part of the person subpoenaed to cooperate in this endeavor. See Note, Subpoena of Documents Located in Foreign Jurisdiction Where Law of Situs Prohibits Removal, 37 N.Y.U.L.Rev. 295 (1962). Similar assertions were made by the defendants in this case. The court below held that defendants had failed to offer any proof on the applicable foreign law, but if it were later shown that compliance would violate foreign law, the injunction could be modified accordingly.

for the collection of a tax claim. Government of India v. Taylor, [1955] A.C. 516; Moore v. Mitchell, 28 F.2d 997 (S.D.N.Y. 1928), aff'd, 30 F.2d 600, 65 A.L.R. 1354 (2d Cir., 1929), aff'd on other grounds, 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930); State of Colorado v. Harbeck, 232 N.Y. 71, 133 N.E. 357 (1921). Contra, State ex rel. Oklahoma Tax Comm'n v. Rodgers, 238 Mo.App. 1115, 193 S W.2d 919, 165 A.L.R. 785 (1946). The nations of the world have only recently begun to deal with the problem of extra-territorial collection of tax revenues through the medium of negotiated tax treaties providing for mutual cooperation.[12] See Note, International Enforcement of Tax Claims, 50 Colum.L.Rev. 490 (1950). Absent an explicit indication to the contrary, there should not be attributed to Congress an intent to give the courts of this nation, in this highly sensitive area of intergovernmental relations, the power to affect rights to property wherever located in the world. The apparent necessity of tax treaties underscores the conclusion that Congress has seen fit to handle this problem in another manner.

### III

Although the result here is in large part dictated by a state rule having its genesis in policy considerations having little to do with the collection of the revenue, application of that rule to the facts here comports with sound reason and public policy. Unfortunate as it may be that Omar will be able to escape, at least partially, from a possible tax liability involving substantial sums, in the long run it is unlikely that a different rule here would provide much consolation to the Internal Revenue Service. The artful tax dodger would not have to be too sophisticated to realize that all he need do to escape liability is place his deposits in a bank of local origin that is beyond the power of our courts. This would lead only to harmful consequences for our banking system abroad without any concomitant benefits here at home.

In addition, the rule suggested by the Government would have to work both ways. As yet, our courts have been faced only with cases seeking to attach deposits in foreign branches of American banks by service on the home office here, Bluebird Undergarment Corp. v. Gomez, supra; Clinton Trust Co. v. Compania Azucarera Central Mabay S.A., supra; Philipps v. Chase National Bank, supra; McCloskey v. Chase Manhattan Bank, supra, and others seeking to attach deposits in foreign banks by service on a branch of such a bank doing business in New York. Clinton Trust Co. v. Compania Azucarera Central Mabay S.A., supra; Philipps v. Chase National Bank, supra; McCloskey v. Chase Manhattan Bank, supra, and others seeking to attach deposits in foreign banks by service on a branch of such a bank doing business in New York. Clinton Trust Co. v. Compania Azucarera Central Mabay S.A., supra; Walsh v. Bustos, supra; Cronan v. Schilling, supra; Newtown Jackson Co. v. Animashaun, supra. However, it is inconceivable that the issuance of an injunction by a court of a foreign country against an American branch bank affecting the accounts or activities of the head office in the United States would be looked upon with favor. The untoward difficulties and potential conflict between the laws of different nations that such a doctrine would produce militate against giving it support here.

The court concludes that the injunction issued by the district court was beyond its jurisdiction as to deposits held abroad that are collectible only outside the United States. The record, however, does not make clear whether any special arrangements may have existed between Citibank and Omar making the deposit payable, not in pesos at Montevideo, but in dollars in New York. The injunction should therefore be modified in such a way as to preserve any rights of the Government should it appear that Omar's accounts were in fact payable in New York.

---

12. No such treaty exists with Uruguay. 4 CCH Fed.Tax Rep. ¶ 4281.

Vacated in part and remanded for modification of the injunction in conformity with this opinion.

HAYS, Circuit Judge (dissenting).

In his learned opinion my brother Moore has almost completely lost sight of what it is that we are asked to review. The extensive dissertation on the nature and characteristics of attachable or lienable property under New York law is an admirable display of my colleague's well known erudition and of his customary careful and exhaustive research. But it has little if anything to do with the case in hand.

The order appealed from was issued by the district court under the authority of § 7402(a) of the Internal Revenue Code of 1954 which provides:

"The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, and of *ne exeat republica*, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."

The order of the district court does not purport to establish or enforce any lien on any property or to direct the payment of any sums whatever. It is a simple order, confined to a direction to the appellant (and certain others) to keep the property of the taxpayer which they now hold. The order reads:

"Ordered, that pending the determination of this action or until further order of this Court, the defendants, Lazard Freres & Co., Lehman Brothers, Belgian-American Banking Corp. and First National City Bank of New York, or any of them, be and they are hereby restrained from selling, transferring, pledging, encumbering, disposing of, or distributing any property or rights to property of Omar, S.A., including, but not limited to, any sums, credits, stock, or bonds or any interest, dividends, or other earnings thereon now held for or for the account of the said Omar, S.A., by them or by any of their branches, agents, or nominees whether located within the United States or not and whether their branches, agents, or nominees are located within the United States or not."

The record indicates that the district court was completely justified in issuing the injunction. In May 1962 counsel for taxpayer told government representatives that if the government should attempt to establish tax liability, taxpayer would liquidate its holdings in the United States. Later one of taxpayer's directors came to the United States and began a systematic liquidation of those holdings. By October 31, 1962, when the Commissioner assessed jeopardy assessments totalling $19,300,000, taxpayer had already transferred at least $2,300,000 out of the country.

The order is merely a preliminary injunction to prevent further dissipation of taxpayer's assets. The district court did not determine, nor was there any occasion for its determining, whether the government's lien attached to all the property immobilized by the order, or what part of such property the government would be able to get possession of in the later stages of this proceeding or in some other proceeding.

There is no doubt that the district court, having in personam jurisdiction over appellant, had the power to issue its order. Indeed appellant does not deny such power except with respect to property of the taxpayer held by appellant's foreign branches. The district court has the power to order the appellant over whom it has personal jurisdiction to act or to refrain from acting both within and without the territorial jurisdiction of the court. United States v. Ross, 302 F.2d

831 (2d Cir., 1962). It is of no consequence, as the majority believes, that the court does not have jurisdiction over Omar. The court's jurisdiction is not in any sense jurisdiction over the res, it is jurisdiction over the person of the appellant.

The present issue as to property of the taxpayer which is held by appellant's foreign branches is not, as the majority believes, whether that property can be recovered in the pending proceeding. The only issue is whether appellant has power to carry out the order of the court with respect to that property. It is clear that appellant has that power (First National City Bank v. Internal Revenue Service, 271 F.2d 616 (2d Cir., 1959), cert. denied 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960)), and indeed appellant does not deny that it could prevent its foreign branches from releasing property to the taxpayer.

Appellant cannot at this stage be permitted to argue that, although it does not deny that it could effectively prevent its foreign branches from paying out money to the taxpayer, it cannot be required to do so because the government may not be able to recover that money in the present suit. Neither the district court nor this court can or should decide on the present record that the government has no recourse by which it could ever recover the property which the government seeks to protect from dissipation. Even if it should be granted that in the present proceeding the government could not recover property of the taxpayer held by a foreign branch, is this court now prepared to hold, for example, that there is no possibility that a receiver appointed under the authority of § 7402(a) would be able to proceed against taxpayer's property under any circumstances or anywhere other than New York? The majority's reference to the absence of a tax treaty with Uruguay is irrelevant since not only is the absence of such a treaty not dispositive, but there is nothing in the record before us to show that foreign branches of appellant other than that in

Montevideo do not hold property of the taxpayer.

The result of the present decision is a wholly unwarranted limitation on the government's power to preserve property of delinquent taxpayers from dissipation pending proceedings to recover that property. With respect I must dissent.